## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DAVID FISK, Individually and on Behalf of All Others Similarly Situated, ) ) ) | |
| Plaintiff, ) ) | Case No. |
| v. ) ) | **CLASS ACTION COMPLAINT FOR** |
| TALLGRASS ENERGY, LP, WILLIAM R. MOLER, MARCELINO OREJA ARBURUA, GUY G. BUCKLEY, ROY N. COOK, THOMAS A. GERKE, WALLACE C. HENDERSON, MATTHEW J.K. RUNKLE, and TERRANCE D. TOWNER, ) ) ) ) ) ) ) | **VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934** **JURY TRIAL DEMANDED** |
| Defendants. ) ) ) ) ) | |

Plaintiff David Fisk ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.     This action is brought as a class action by Plaintiff on behalf of himself and the other public holders of the common stock of Tallgrass Energy, LP ("TGE" or the "Partnership") against the Partnership and the members of Tallgrass Energy GP, LLC's ("TGE GP") board of directors (collectively, the "Board" or "Individual Defendants" and, together with TGE, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, and Regulation G, 17 C.F.R. § 244.100, in connection with the proposed merger (the "Proposed Transaction") between TGE and affiliates of Blackstone Infrastructure Partners together with affiliates of Enagas, GIC, NPS and USS (collectively, "Blackstone").

2.      On December 16, 2019, the Board caused the Partnership to enter into an agreement and plan of merger ("Merger Agreement"), pursuant to which the Partnership's shareholders stand to receive $22.45 in cash for each Class A share representing a limited partner interest of TGE they own (the "Merger Consideration").

3.      On January 21, 2020, in order to convince TGE shareholders to vote in favor of the Proposed Transaction, the Board authorized the filing of a materially incomplete and misleading Form PREM14A Preliminary Proxy Statement (the "Proxy") with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act.   The materially incomplete and misleading preliminary proxy violates both Regulation G (17 C.F.R. § 244.100) and SEC Rule 14a-9 (17 C.F.R. § 240.14a-9), each of which constitutes a violation of Sections 14(a) and 20(a) of the Exchange Act.

4.      While touting the fairness of the Merger Consideration to the Partnership's shareholders in the Proxy, Defendants have failed to disclose certain material information that is necessary for shareholders to properly assess the fairness of the Proposed Transaction, thereby violating SEC rules and regulations and rendering certain statements in the Proxy materially incomplete and misleading.

5.      In particular, the Proxy contains materially incomplete and misleading information concerning: (i) the financial projections for the Partnership that were prepared by the Partnership and relied on by Defendants in recommending that TGE shareholders vote in favor of the Proposed Transaction; and (ii) the summary of certain valuation analyses conducted by TGE's financial advisor, Evercore Group L.L.C. ("Evercore") in support of its opinion that the Merger Consideration is fair to shareholders, on which the Board relied.

6.      It is imperative that the material information that has been omitted from the Proxy is disclosed prior to the forthcoming vote to allow the Partnership's shareholders to make an informed decision regarding the Proposed Transaction.

7.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, based on Defendants' violation of: (i) Regulation G (17 C.F.R. § 244.100); and (ii) Rule 14a-9 (17 C.F.R. § 240.14a-9). Plaintiff seeks to enjoin Defendants from holding the shareholder vote on the Proposed Transaction and taking any steps to consummate the Proposed Transaction unless, and until, the material information discussed below is disclosed to TGE shareholders sufficiently in advance of the vote on the Proposed Transaction or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.

9.      Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

10.      Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because TGE is a limited partnership organized in this District.

## PARTIES

11.     Plaintiff is, and at all relevant times has been, a holder of TGE common stock.

12.     Defendant TGE is a limited partnership organized under the laws of Delaware and maintains its principal executive offices at 4200 W. 115th Street, Suite 350, Leawood, Kansas 66211.  The Partnership's Class A shares trade on the NYSE under the ticker symbol "TGE."

13.     Individual Defendant William R. Moler is TGE GP's Chief Executive Officer and has been a director of TGE GP at all relevant times.

14.     Individual Defendant Marcelino Oreja Arburua has been a director of TGE GP since March 2019.

15.     Individual Defendant Guy G. Buckley has been a director of TGE GP since March 2019.

16.     Individual Defendant Roy N. Cook has been a director of TGE GP at all relevant times.

17.     Individual Defendant Thomas A. Gerke has been a director of TGE GP at all relevant times.

18.     Individual Defendant Wallace C. Henderson has been a director of TGE GP since March 2019.

19.     Individual Defendant Matthew J.K. Runkle has been a director of TGE GP since March 2019.

20.     Individual Defendant Terrance D. Towner has been a director of TGE GP at all relevant times.

21.     The Individual Defendants referred to in paragraphs 13-20 are collectively referred to herein as the "Individual Defendants" and/or the "Board."

## CLASS ACTION ALLEGATIONS

22.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public shareholders of TGE (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

23.     This action is properly maintainable as a class action because:

       a.     The Class is so numerous that joinder of all members is impracticable.  As of January 21, 2020, there were approximately 156,000,000 shares of TGE Class A shares representing limited partner interests outstanding, held by hundreds of individuals and entities scattered throughout the country.  The actual number of public shareholders of TGE will be ascertained through discovery;

       b.     There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

          i)     whether Defendants disclosed material information that includes non-GAAP financial measures without providing a reconciliation of the same non-GAAP financial measures to their most directly comparable GAAP equivalent in violation of Section 14(a) of the Exchange Act;

          ii)     whether Defendants have misrepresented or omitted material information concerning the Proposed Transaction in the Proxy in violation of Section 14(a) of the Exchange Act;

iii)    whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

iv)    whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Transaction based on the materially incomplete and misleading Proxy.

c.    Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d.    Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f.    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g.    A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

**I.     The Proposed Transaction**

24.     TGE is a limited partnership that owns, operates, acquires and develops midstream energy assets in North America. The Partnership operates and owns its operating assets through its direct and indirect subsidiaries. Tallgrass maintains three reportable business segments: Natural Gas Transportation, Crude Oil Transportation, and Gathering, Processing & Terminalling.

25.     TGE GP is the general partner of TGE, and TGE is controlled by TGE GP through TGE GP's board of directors.

26.     On December 17, 2019, TGE and Blackstone issued a joint press release announcing the Proposed Transaction, which states in pertinent part:

> LEAWOOD, Kan.--(BUSINESS WIRE)--Tallgrass Energy, LP (NYSE: TGE) today announced that it has entered into a definitive merger agreement pursuant to which affiliates of Blackstone Infrastructure Partners together with affiliates of Enagas, GIC, NPS and USS (collectively with Blackstone Infrastructure Partners, the "Sponsors") will acquire all of the publicly-held outstanding Class A Shares of TGE for $22.45 in cash per Class A Share.
>
> The transaction is expected to close in the second quarter of 2020, subject to the satisfaction of customary conditions, including approval of the merger by holders of a majority of the outstanding Class A and Class B Shares of TGE, voting together as a single class, inclusive of the approximately 44 percent of the total Class A and Class B Shares held by the Sponsors. Upon closing of the transaction, the Class A Shares will cease to be publicly traded. Pursuant to the merger agreement, TGE has agreed not to pay distributions during the pendency of the transactions contemplated by the merger agreement.
>
> The Conflicts Committee of the Board of Directors of Tallgrass Energy GP, LLC, TGE's General Partner ("TGE GP"), after consultation with its independent legal and financial advisors, unanimously approved the transaction and determined it to be in the best interests of TGE and its public shareholders.
>
> The Sponsors expect to fund the purchase of the Class A Shares with approximately $3 billion of equity, with the remainder of the funding necessary to consummate the transaction provided by debt.
>
> Citigroup Global Markets Inc. and Credit Suisse Securities (USA) LLC served as

financial advisors and Vinson & Elkins L.L.P. acted as legal advisor to Blackstone Infrastructure Partners. Latham & Watkins LLP acted as legal advisor to Enagas. Sidley Austin LLP acted as legal advisor to GIC.

Evercore Group LLC served as the financial advisor and Bracewell LLP acted as legal advisor to the Conflicts Committee of the Board of Directors of TGE's General Partner.

Baker Botts L.L.P. acted as legal advisor to TGE.

**About Tallgrass Energy**

Tallgrass Energy, LP (NYSE: TGE) is a growth-oriented midstream energy infrastructure company operating across 11 states with transportation, storage, terminal, water, gathering and processing assets that serve some of the nation's most prolific crude oil and natural gas basins.

To learn more, please visit our website at www.tallgrassenergy.com.

**About Blackstone**

Blackstone is one of the world's leading investment firms. We seek to create positive economic impact and long-term value for our investors, the companies we invest in, and the communities in which we work. We do this by using extraordinary people and flexible capital to help companies solve problems. Our asset management businesses, with $554 billion in assets under management, include investment vehicles focused on private equity, real estate, public debt and equity, growth equity, opportunistic, non-investment grade credit, real assets and secondary funds, all on a global basis. Further information is available at www.blackstone.com. Follow Blackstone on Twitter @Blackstone.

Infrastructure is one of Blackstone's most active investment areas. Over the last 15 years, we have invested in more than $45 billion of infrastructure-related projects globally. Blackstone's approach to infrastructure investing is one that puts a focus on responsible stewardship and community engagement. In areas such as clean power, energy transmission, communications technology, and many others, we have helped move forward sustainable projects that drive local economic growth and job creation, and enhance quality of life. In doing so, we work closely with civic stakeholders to help make sure that critical infrastructure is developed in a responsible manner that is responsive to community needs.

**About Enagas**

Enagás is a leading international energy company with 50 years' experience. It is one of the companies with the most LNG terminals in the world. It has a presence in Spain, the USA, Mexico, Chile, Peru and Greece. It is also one of the

shareholders in the Trans Adriatic Pipeline (TAP), which will connect Greece, Albania and Italy to bring natural gas from the Caspian Sea to Europe. The company is certified as a Transmission System Operator (TSO) by the European Union and is an international benchmark in the development and operation of gas networks. It owns more than 12,000 km of gas pipelines, three strategic storages and nine regasification plants. In Spain, Enagás is the Technical Manager of the Gas System and has developed the country's key gas infrastructures, making it a model within Europe.

Listed on the IBEX 35 Spanish stock market, Enagás has also been present in the main sustainability indexes such as the Dow Jones Sustainability Index (DJSI), for eleven consecutive years. The company is the world leader of its sector, according to the latest DJSI revision.

Enagás is also committed to the fight against climate change through initiatives to promote the use of renewable gases, such as biomethane and hydrogen, and through the development of actions for energy efficiency and sustainable mobility. For more information about Enagás: www.enagas.es

Twitter: @enagas

**About GIC**

GIC is a leading global investment firm established in 1981 to manage Singapore's foreign reserves. As a disciplined long-term value investor, GIC is uniquely positioned for investments across a wide range of asset classes, including equities, fixed income, private equity, real estate and infrastructure. In infrastructure, GIC's primary strategy is to invest directly in operating assets with a high degree of cash flow visibility and which provide a hedge against inflation. GIC has investments in over 40 countries. Headquartered in Singapore, GIC employs over 1,500 people across 10 offices in key financial cities worldwide. For more information on GIC, please visit www.gic.com.sg or LinkedIn.

**About NPS**

NPS is a public pension fund in South Korea with assets under management of KRW 714.3 trillion ($620 billion) as at September 30, 2019. Established in 1988, the purpose of the fund is to maximize investment return while maintaining long-term fiscal stability to stabilize and promote public livelihood and welfare in the Korea. With a distinct risk-return profile from traditional asset classes, alternative investments portfolio of NPS has contributed to generating sustainable returns for the total portfolio. NPS is headquartered in Korea and has 3 overseas offices in New York, London, and Singapore. For more information about NPS, please visit fund.nps.or.kr.

**About USS**

USSL is the corporate trustee of one of the largest private sector pension funds in the UK with assets under management of £68 billion as at 31 March 2019 and over 400,000 members across more than 350 universities and other higher education and associated institutions in the UK.

USSL, through its investment manager, USSIM, is a long-term owner of assets with a track record of investing in infrastructure and infrastructure-like businesses.

27.     TGE is well-positioned for financial growth and the Merger Consideration fails to adequately compensate the Partnership's shareholders.  It is imperative that Defendants disclose the material information they have omitted from the Proxy, discussed in detail below, so that the Partnership's shareholders can properly assess the fairness of the Merger Consideration for themselves and make an informed decision concerning whether or not to vote in favor of the Proposed Transaction.

28.     If the false and/or misleading Proxy is not remedied and the Proposed Transaction is consummated, Defendants will directly and proximately have caused damages and actual economic loss (i.e., the difference between the value to be received as a result of the Proposed Transaction and the true value of their shares prior to the merger), in an amount to be determined at trial, to Plaintiff and the Class.

## II.     The Materially Incomplete and Misleading Proxy

29.     On January 21, 2020, Defendants caused the Proxy to be filed with the SEC in connection with the Proposed Transaction. The Proxy solicits the Partnership's shareholders to vote in favor of the Proposed Transaction. Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Partnership's shareholders to ensure that it did not contain any material misrepresentations or omissions.  However, the Proxy misrepresents and/or omits material information that is necessary for the Partnership's shareholders to make an

informed decision concerning whether to vote in favor of the Proposed Transaction, in violation of Sections 14(a) and 20(a) of the Exchange Act.

### *The Materiality of Financial Projections*

30.     A company's financial forecasts are material information a board relies on to determine whether to approve a merger transaction and recommend that shareholders vote to approve the transaction.  Here, the Proxy discloses that "in connection with the evaluation of a potential transaction, management of TGE provided multi-year projections to Evercore and the Conflicts Committee in connection with their consideration of the Transactions." Proxy 37.

31.     When soliciting proxies from shareholders, a company must furnish the information found in Schedule 14A (codified as 17 C.F.R. § 240.14a-101).  Item 14 of Schedule 14A sets forth the information a company must disclose when soliciting proxies regarding mergers and acquisitions.  In regard to financial information, companies are required to disclose "financial information required by Article 11 of Regulation S-X[,]" which includes Item 10 of Regulation S-K.  *See* Item 14(7)(b)(11) of 17 C.F.R. § 240.14a-101.

32.     Under Item 10 of Regulation S-K, companies are encouraged to disclose "management's projections of future economic performance that have a reasonable basis and are presented in an appropriate format."  17 C.F.R. § 229.10(b).  Although the SEC recognizes the usefulness of disclosing projected financial metrics, the SEC cautions companies to "take care to assure that the choice of items projected is not susceptible of misleading inferences through selective projection of only favorable items."  17 C.F.R. § 229.10(b)(2).

33.     In order to facilitate investor understanding of a company's financial projections, the SEC provides companies with certain factors "to be considered in formulating and disclosing such projections[,]" including:

(i) When management chooses to include its projections in a Commission filing, *the disclosures accompanying the projections should facilitate investor understanding of the basis for and limitations of projections.* In this regard investors should be cautioned against attributing undue certainty to management's assessment, and the Commission believes that investors would be aided by a statement indicating management's intention regarding the furnishing of updated projections. *The Commission also believes that investor understanding would be enhanced by disclosure of the assumptions which in management's opinion are most significant to the projections or are the key factors upon which the financial results of the enterprise depend and encourages disclosure of assumptions in a manner that will provide a framework for analysis of the projection.*

(ii) Management also should consider whether disclosure of the accuracy or inaccuracy of previous projections would provide investors with important insights into the limitations of projections. In this regard, *consideration should be given to presenting the projections in a format that will facilitate subsequent analysis of the reasons for differences between actual and forecast results.* An important benefit may arise from the systematic analysis of variances between projected and actual results on a continuing basis, since such disclosure may highlight for investors the most significant risk and profit-sensitive areas in a business operation.

17 C.F.R. § 229.10(b)(3) (emphasis added).

34.     Here, TGE's shareholders would clearly find complete and non-misleading financial projections material in deciding how to vote, considering that in making its recommendation that shareholders vote in favor of the Proposed Transaction, the Board specifically relied on the financial forecasts to form the belief that the "Merger Consideration represented the highest consideration that reasonably could be obtained from a potential business combination transaction with the Sponsors, that the Merger Consideration was more favorable to the TGE Unaffiliated Shareholders than continuing to hold Class A shares, and that the Merger presents the best available opportunity to maximize value for the TGE Unaffiliated Shareholders." Proxy 32.

35.     As discussed further below, the non-GAAP financial projections used do not provide TGE's shareholders with a materially complete understanding of the assumptions and key factors considered in developing the financial projections, which assumptions, factors and other inputs the Board reviewed.

### *The Financial Projections Relied on by the Board*

36.     The Proxy discloses that "in connection with the evaluation of a potential transaction, management of TGE provided multi-year projections to Evercore and the Conflicts Committee in connection with their consideration of the Transactions." *Id.* at 37. Both a Management Case and a Historical Growth Capital Expenditure Case were disclosed. *Id.* at 37-40.

37.     The Proxy further discloses that "in the view of management and as of the date prepared, [the projections] were prepared on a reasonable basis, reflected the best currently available estimates and judgments, and presented, to the best of management of TGE's knowledge and belief, the expected future financial performance of TGE." *Id.* at 38.

38.     The Proxy goes on to disclose, *inter alia*, forecasted values for projected non-GAAP (Generally Accepted Accounting Principles) financial metrics for 2020 through 2023 for: (1) Adjusted EBITDA and (2) Cash Available for Dividends but fails to provide (i) the line items used to calculate these non-GAAP metrics nor (ii) a reconciliation of these non-GAAP projections to the most comparable GAAP measures. *Id.* at 39-40.

39.     The Proxy defines Adjusted EBITDA as "net income excluding the impact of interest, income taxes, depreciation and amortization, non-cash income or loss related to derivative instruments, non-cash long-term compensation expense, impairment losses, gains or losses on asset or business disposals or acquisitions, gains or losses on the repurchase, redemption or early retirement of debt, and earnings from unconsolidated investments, but including the impact of distributions from unconsolidated investments and deficiency payments received from or utilized by TGE's customers." *Id.* at 40. Nevertheless, the Proxy fails to reconcile Adjusted EBITDA to its most comparable GAAP measure or disclose the line items used to calculate Adjusted EBITDA, rendering the use of Adjusted EBITDA in the Proxy materially false and/or misleading. *Id.*

40.     The Proxy defines Cash Available for Dividends ("CAD") as "Adjusted EBITDA, less cash interest costs, maintenance capital expenditures, current income tax, and certain cash reserves permitted by TGE's governing documents." *Id.*  Nevertheless, the Proxy fails to reconcile CAD to its most comparable GAAP measure or disclose the line items used to calculate CAD, rendering the use of CAD in the Proxy materially false and/or misleading.  *Id.*

41.     Thus, the Proxy's disclosure of these non-GAAP financial forecasts provides an incomplete and materially misleading understanding of the Partnership's future financial prospects and the inputs and assumptions for which those prospects are based upon.  It is clear that those inputs and assumptions were in fact forecasted and utilized in calculating the non-GAAP measures disclosed and relied on by the Board to recommend the Proposed Transaction in violation of Section 14(a) of the Exchange Act.

42.     The non-GAAP financial projections disclosed on pages 39-40 of the Proxy violate Section 14(a) of the Exchange Act because: (i) the use of such forecasted non-GAAP financial measures alone violates SEC Regulation G as a result of Defendants' failure to reconcile those non-GAAP measures to their closest GAAP equivalent or otherwise disclose the specific financial assumptions and inputs used to calculate the non-GAAP measures; and (ii) they violate SEC Regulation 14a-9 because they are materially misleading as without any correlation with their GAAP equivalent financial metrics, shareholders are unable to discern the veracity of the financial projections.

43.     As such, this information must be disclosed in order to cure the materially misleading disclosures regarding both the financial projections developed by the Partnership as well as the projections relied upon by the Partnership's financial advisors.

### *The Financial Projections Violate Regulation G*

44.     The SEC has acknowledged that potential "misleading inferences" are exacerbated when the disclosed information contains non-GAAP financial measures[1] and adopted Regulation G[2] "to ensure that investors and others are not misled by the use of non-GAAP financial measures."[3]

45.     Defendants must comply with Regulation G.  More specifically, the Partnership must disclose the most directly comparable GAAP financial measure <u>and</u> a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial measure disclosed or released with the most comparable financial measure or measures calculated and presented in accordance with GAAP.  17 C.F.R. § 244.100.  This is because the SEC believes "this reconciliation will help investors . . . to better evaluate the non-GAAP financial measures . . . . [and] more accurately evaluate companies' securities and, in turn, result in a more accurate pricing of securities."[4]

46.     Moreover, the SEC has publicly stated that the use of non-GAAP financial measures can be misleading.[5]  Former SEC Chairwoman Mary Jo White has stated that the frequent

---

[1]     Non-GAAP financial measures are numerical measures of future financial performance that exclude amounts or are adjusted to effectively exclude amounts that are included in the most directly comparable GAAP measure.  17 C.F.R. § 244.101(a)(1).

[2]     Item 10 of Regulations S-K and S-B were amended to reflect the requirements of Regulation G.

[3]     SEC, *Final Rule: Conditions for Use of Non-GAAP Financial Measures* (Jan. 22, 2003), *available at* https://www.sec.gov/rules/final/33-8176.htm ("SEC, *Final Rule*").

[4]     SEC, *Final Rule.*

[5]     *See, e.g.*, Nicolas Grabar and Sandra Flow, *Non-GAAP Financial Measures: The SEC's Evolving Views*, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), *available at* https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measures-the-secs-evolving-views/; Gretchen Morgenson, *Fantasy Math Is Helping Companies Spin Losses Into Profits*, N.Y. Times, Apr. 22, 2016, *available at* http://www.nytimes.com/2016/04/24/business/fantasy-math-is-helping-companies-spin-losses-into-profits.html?_r=0.

use by publicly traded companies of unique company-specific non-GAAP financial measures (as

TGE included in the Proxy here) implicates the centerpiece of the SEC's disclosures regime:

> In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation. Jim Schnurr, our Chief Accountant, Mark Kronforst, our Chief Accountant in the Division of Corporation Finance and I, along with other members of the staff, have spoken out frequently about our concerns to raise the awareness of boards, management and investors.  And last month, the staff issued guidance addressing a number of troublesome practices *which can make non-GAAP disclosures misleading*: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data.  I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures.  I also urge again, as I did last December, that appropriate controls be considered and that audit committees carefully oversee their company's use of non-GAAP measures and disclosures.[6]

47.     The SEC has required compliance with Regulation G, including reconciliation

requirements in other merger transactions.  *Compare Youku Tudou Inc., et al.*, Correspondence 5

(Jan. 11, 2016) (Issuer arguing that Rule 100(d) of Regulation G does not apply to non-GAAP

financials relating to a business combination),[7] *with Youku Tudou Inc., et al.*, SEC Staff Comment

Letter 1 (Jan. 20, 2016) ("[The SEC] note[s] that your disclosure of projected financial information

is not in response to the requirements of, or pursuant to, Item 1015 of Regulation M-A and is thus

not excepted from Rule 100 of Regulation G.");[8] *see Harbin Electric, Inc.*, Correspondence 29

(Aug. 12, 2011) ("Pursuant to the requirements of Regulation G, we have added a reconciliation

---

[6]     Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), *available at* https://www.sec.gov/news/speech/chair-white-icgn-speech.html (emphasis added) (footnotes omitted).

[7]     *Available at* https://www.sec.gov/Archives/edgar/data/1442596/000110465916089133/filename1.htm.

[8]     *Available at* https://www.sec.gov/Archives/edgar/data/1442596/000000000016062042/filename1.pdf.

of actual and projected EBIT to GAAP net income . . . .").[9]

48.     Compliance with Regulation G is mandatory under Section 14(a), and non-compliance constitutes a violation of Section 14(a).  Thus, in order to bring the Proxy into compliance with Regulation G, Defendants must provide a reconciliation of the non-GAAP financial measures to their respective most comparable GAAP financial measures.

### The Financial Projections are Materially Misleading and Violate SEC Rule 14a-9

49.     In addition to the Proxy's violation of Regulation G, the lack of reconciliation or, at the very least, the line items utilized in calculating the non-GAAP measures render the financial forecasts disclosed materially misleading as shareholders are unable to understand the differences between the non-GAAP financial measures and their respective most comparable GAAP financial measures.  Nor can shareholders compare the Partnership's financial prospects with similarly situated companies.

50.     Such projections are necessary to make the non-GAAP projections included in the Proxy not misleading for the reasons discussed above. Indeed, Defendants acknowledge that

---

[9]     *Available at* https://www.sec.gov/Archives/edgar/data/1266719/000114420411046281/ filename1.htm.  *See also Actel Corporation*, SEC Staff Comment Letter 2 (Oct. 13, 2010) ("Opinion of Actel's Financial Advisor, page 24 . . . This section includes non-GAAP financial measures.  Please revise to provide the disclosure required by Rule 100 of Regulation G."), *available at* https://www.sec.gov/Archives/edgar/data/907687/000000000010060087/filename 1.pdf.  *See also The Spectranetics Corp.*, SEC Staff Comment Letter 1 (July 18, 2017) ("Item 4. The Solicitation or Recommendation Certain Spectranetics Forecasts, page 39 . . . [P]rovide the reconciliation required under Rule 100(a) of Regulation G"), *available at* https://www.sec.gov/Archives/edgar/data/789132/000000000017025180/filename1.pdf.     The SEC Office of Mergers and Acquisitions applied Regulation G in these transactions, which reflect the SEC's official position.  Any claim that the SEC has officially sanctioned the use of non-GAAP financial forecasts for business combinations when the Board itself created and relied on such non-GAAP forecasts to recommend a transaction such as the Proposed Transaction is incorrect. The SEC's website provides certain unofficial guidance for certain matters, called Compliance and Disclosure Interpretations ("C&DI's") which through the use of Q&As reflect the views of particular SEC staff and on which certain issuers have in the past claimed an exemption from Regulation G.  The SEC itself expressly disclaims C&DI's as they are not regulations that have been reviewed by the SEC, and the SEC expressly states that they are not binding and should not be relied on.  *See* www.sec.gov/divisions/corpfin/cfguidance.shtml.

Adjusted EBITDA and CAD are non-GAAP financials and the Proxy provides reconciliations of Adjusted EBITDA and CAD when it is reported on a historical basis. Proxy 116-17.

51.    As such, financial projections are plainly material, and shareholders would clearly want a complete and non-misleading understanding of those projections.

52.    In order to cure the materially misleading nature of the projections under SEC Rule 14a-9 as a result of the omitted information on page 39-40, Defendants must provide a reconciliation table of the non-GAAP financial measures to the most comparable GAAP measures.

**_The Materially Misleading Financial Analyses_**

53.    The summary of the valuation methodologies utilized by Evercore including the utilization of certain of the non-GAAP financial projections described above by Evercore, in connection with its valuation analyses, (_id._ at 41) is misleading in violation of Regulation 14a-9. The opacity concerning the Partnership's internal projections renders the valuation analyses described below materially incomplete and misleading, particularly as companies formulate non-GAAP metrics differently.  Once a proxy discloses internal projections relied upon by the Board, those projections must be complete and accurate.

54.    Evercore's fairness opinion values TGE on a corporate level and as a sum of its parts.

55.    With respect to Evercore's _Corporate Level—Discounted Dividend Analysis_, Evercore calculated the net present value of the projected future dividends for the fiscal year ending December 31, 2020 through the fiscal year ending December 31, 2023, based on the Historical Growth Capital Expenditure Case. _Id._ at 44. Evercore added a terminal value applying a terminal yield range of 8.0% to 12.0%. _Id._ Evercore used a cost of equity range of 7.5% to 8.5%

based on the capital asset pricing model and a cost of equity range of 11.0% to 13.0% based on the total expected market return. *Id.*

56.     The Proxy fails to disclose the calculated terminal values, the inputs to the cost of equity and the total expected market return and does not make any indication on which discount rate more accurately values the Partnership.

57.     Evercore performed a DCF analysis on TGE both at the corporate level and as a sum of its parts. With respect to Evercore's *Corporate Level—Discounted Cash Flow Analysis*, the Proxy states that Evercore performed a DCF analysis of the Partnership by valuing the after-tax cash flows that the Partnership was forecasted to generate, based on the Historical Growth Capital Expenditure Case. *Id.* at 43. Evercore calculated a range of terminal values by using an EBITDA exit multiple range of 9.0x to 11.0x and a range of perpetuity growth rates of 0.25% to 0.75%. *Id.* In order to calculate estimates of the Partnership's enterprise value, Evercore applied a range of discount rates of 6.5% to 7.5%, based on the Partnership's weighted cost of capital, to the after-tax cash flows and the calculated terminal values. *Id.* Evercore then adjusted the enterprise values for debt and cash projected as of January 1, 2020 and divided the adjusted values by the number of Class A shares projected to be outstanding as of January 1, 2020. *Id.*

58.     With respect to Evercore's *Sum of the Parts—Discounted Cash Flow Analysis*, Evercore performed a series of discounted cash flow analyses on segments of TGE. *Id.* at 45. The TGE segments included Rockies Express Pipeline LLC, Tallgrass Interstate Gas Transmission, LLC and Trailblazer Pipeline Company LLC, Pony Express Pipeline, Powder River Gateway, LLC and Stanchion Energy, LLC, Tallgrass Terminals, LLC, Tallgrass Midstream, LLC, BNN Water Solutions, LLC, Unidentified annual growth capital expenditures as provided in the Historical Growth Capital Expenditure Case, Corporate general and administrative expenses, and Cash taxes

as provided by TGE management. *Id.* In valuing the individual segments, Evercore calculated ranges of implied enterprise value utilizing a range of after-tax discount rates based on the segment's peers and Evercore's professional judgment, and terminal values based on a range of estimated EBITDA exit multiples based on the segment's peer trading multiples and perpetuity growth rates. *Id.* at 46-47. With respect to Corporate general and administrative expenses, Evercore only applied an EBITDA multiple range based on the weighted average EBITDA exit multiple of the other segments. *Id.* at 47. With respect to Cash taxes as provided by TGE management, Evercore applied after-tax discount rates based on corporate-level after tax weighted average cost of capital and a perpetuity growth rate based on corporate-level perpetuity growth rates. *Id.*

59.    To calculate the implied equity value, Evercore aggregated the implied enterprise values of the segments and subtracted the range of enterprise values for Corporate general and administrative expenses and Cash taxes as provided by TGE management. *Id.* at 45. This sum was then divided by the number of Class A shares projected to be outstanding as of January 1, 2020. *Id.*

60.    With respect to Evercore's corporate level DCF analysis, the Proxy does not disclose the value, the definition, nor the line items of the after tax cash flows used in the analysis, the number of years the DCF analyzes, the calculated range of terminal values using both the EBITDA exit multiple and perpetuity growth rate methods, the inputs and assumptions that went into the selection of both the exit multiple range and perpetuity growth rate range, any of the inputs that went into calculating the Partnership's weighted average cost of capital, the Partnership's projected debt and cash as of January 1, 2020, the number of Class A shares projected to be outstanding as of January 1, 2020, nor whether the EBITDA exit multiple methodology or the perpetuity growth rate method more accurately values the Partnership.

61.     With respect to Evercore's sum of the parts DCF analysis, the Proxy does not disclose, for any segment,  the value, the definition, nor the line items of the after tax cash flows used in the analysis, the number of years the DCF analyzes, the calculated range of terminal values using both the EBITDA exit multiple and perpetuity growth rate methods, the inputs and assumptions that went into the selection of both the exit multiple range and perpetuity growth rate range, any of the inputs that went into selecting the range after-tax discount ranges, the number of Class A shares projected to be outstanding as of January 1, 2020, nor whether the EBITDA exit multiple methodology or the perpetuity growth rate method more accurately values the Partnership.

62.     Since information was omitted, shareholders are unable to discern the veracity of Evercore discounted cash flow analyses.  Without further disclosure, shareholders are unable to compare Evercore's calculations with the Partnership's financial projections.  The absence of any single piece of the above information renders Evercore's discounted cash flow analyses incomplete and misleading.  Thus, the Partnership's shareholders are being materially misled regarding the value of the Partnership.

63.     As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow analysis a banker takes management's projections and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006).  Such choices include "the appropriate discount rate, and the terminal value . . . "  *Id.* (footnote omitted).  As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can
> markedly affect the discounted cash flow value . . .  The substantial discretion and

lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness.  This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions[.]

*Id.* at 1577-78 (footnotes omitted).

64. Moreover, the failure to identify whether the EBITDA exit multiple methodology or the perpetuity growth rate method more accurately values the Partnership is particularly misleading because of the extreme difference in value implied by the two methods. On the corporate level, using the EBITDA exit multiple method, Evercore calculated an implied equity value per share range of $17.86 to $25.51. Proxy 43. However, when using the selected perpetuity growth rate, Evercore calculated the implied equity value per share range to be $22.16 to $32.27. *Id.* Compared to the Merger Consideration of $22.45 per share, the Merger Consideration falls in the middle of the EBITDA exit multiple method range while it is at the extreme low end of the perpetuity growth rate method. This material difference also exists in the sum of the parts analysis where Evercore calculated an implied equity value per share range of $16.93 to $24.45 using the EBITDA exit multiple method and an implied equity value per share range of $21.47 to $32.35 using the perpetuity growth rate method. *Id.* at 45.

65. Therefore, in order for TGE shareholders to become fully informed regarding the fairness of the Merger Consideration, the material omitted information must be disclosed to shareholders.

66. In sum, the Proxy independently violates both: (i) Regulation G, which requires a presentation and reconciliation of any non-GAAP financial to their most directly comparable GAAP equivalent; and (ii) Rule 14a-9, since the material omitted information renders certain statements, discussed above, materially incomplete and misleading.  As the Proxy independently contravenes the SEC rules and regulations, Defendants violated Section 14(a) and Section 20(a)

of the Exchange Act by filing the Proxy to garner votes in support of the Proposed Transaction from TGE shareholders.

67.     Absent disclosure of the foregoing material information prior to the special shareholder meeting to vote on the Proposed Transaction, Plaintiff and the other members of the Class will not be able to make a fully-informed decision regarding whether to vote in favor of the Proposed Transaction, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

68.     Further, failure to remedy the deficient Proxy and consummate the Proposed Transaction will directly and proximately cause damages and actual economic loss to shareholders (i.e. the difference between the value to be received as a result of the Proposed Transaction and the true value of their shares prior to the merger), in an amount to be determined at trial, to Plaintiff and the Class.

## COUNT I

### (Against All Defendants for Violations of Section 14(a) of the Exchange Act and 17 C.F.R. § 244.100 Promulgated Thereunder)

69.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

70.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

71.     As set forth above, the Proxy omits information required by SEC Regulation G, 17 C.F.R. § 244.100, which independently violates Section 14(a).  SEC Regulation G, among other things, requires an issuer that chooses to disclose a non-GAAP measure to provide a presentation of the "most directly comparable" GAAP measure and a reconciliation "by schedule or other clearly understandable method" of the non-GAAP measure to the "most directly comparable" GAAP measure.  17 C.F.R. § 244.100(a).

72.     The failure to reconcile the non-GAAP financial measures included in the Proxy violates Regulation G and constitutes a violation of Section 14(a).

73.     As a direct and proximate result of the dissemination of the false and/or misleading Proxy Defendants used to recommend that shareholders approve the Proposed Transaction, Plaintiff and the Class will suffer damages and actual economic losses (i.e. the difference between the value they will receive as a result of the Proposed Transaction and the true value of their shares prior to the merger) in an amount to be determined at trial and are entitled to such equitable relief as the Court deems appropriate, including rescissory damages.

## COUNT II

### (Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder)

74.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

75.     SEC Rule 14a-9 prohibits the solicitation of shareholder votes in registration statements that contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading[.]" 17 C.F.R. § 240.14a-9(a).

76.     Regulation G similarly prohibits the solicitation of shareholder votes by "mak[ing] public a non-GAAP financial measure that, taken together with the information accompanying that measure . . . contains an untrue statement of a material fact or *omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure . . . not misleading*." 17 C.F.R. § 244.100(b) (emphasis added).

77.     Defendants have issued the Proxy with the intention of soliciting shareholder support for the Proposed Transaction. Each of the Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things, the financial projections for the Partnership.

78.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as directors and/or officers, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

79.     The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction.

80.     The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.

81.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy.  The preparation of a registration statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Partnership's directors.  Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Partnership's financial projections.

82.     TGE is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

83.     The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.

84.     As a direct and proximate result of the dissemination of the false and/or misleading Proxy Defendants used to recommend that shareholders approve the Proposed Transaction, Plaintiff and the Class will suffer damages and actual economic losses (i.e. the difference between the value they will receive as a result of the Proposed Transaction and the true value of their shares prior to the merger) in an amount to be determined at trial and are entitled to such equitable relief as the Court deems appropriate, including rescissory damages.

## COUNT III

### (Against the Individual Defendants for Violations
### of Section 20(a) of the Exchange Act)

85.     Plaintiff incorporates each and every allegation set forth above as if fully set forth

herein.

86.     The Individual Defendants acted as controlling persons of TGE within the meaning

of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as directors

and/or officers of TGE, and participation in and/or awareness of the Partnership's operations

and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy

filed with the SEC, they had the power to influence and control and did influence and control,

directly or indirectly, the decision making of the Partnership, including the content and

dissemination of the various statements that Plaintiff contends are materially incomplete and

misleading.

87.     Each of the Individual Defendants was provided with or had unlimited access to

copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or

shortly after these statements were issued and had the ability to prevent the issuance of the

statements or cause the statements to be corrected.

88.     In particular, each of the Individual Defendants had direct and supervisory

involvement in the day-to-day operations of the Partnership and, therefore, is presumed to have

had the power to control or influence the particular transactions giving rise to the Exchange Act

violations alleged herein and exercised the same.  The Proxy at issue contains the unanimous

recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They

were thus directly involved in preparing the Proxy.

89.     In addition, as the Proxy sets forth at length, and as described herein, that the

Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

90.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

91.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.     Enjoining Defendants and all persons acting in concert with them from proceeding with the shareholder vote on the Proposed Transaction or consummating the Proposed Transaction, unless and until the Partnership discloses the material information discussed above which has been omitted from the Proxy;

C.     Directing Defendants to account to Plaintiff and the Class for all damages sustained as a result of their wrongdoing and to award damages arising from proceeding with the Proposed Transaction;

D.     Awarding Plaintiff the costs and disbursements of this action, including reasonable

attorneys' and expert fees and expenses; and

      E.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated:  January 31, 2020

                            Respectfully submitted,

                            **FARUQI & FARUQI, LLP**

                            By: */s/ Michael Van Gorder*

**OF COUNSEL:**                 Michael Van Gorder (#6214)
                            3828 Kennett Pike, Suite 201
**FARUQI & FARUQI, LLP**      Wilmington, DE 19807
Nadeem Faruqi                  Tel.: (302) 482-3182
James M. Wilson, Jr.          Email: mvangorder@faruqilaw.com
685 Third Avenue, 26th Floor
New York, NY 10017
Tel.: (212) 983-9330
Fax: (212) 983-9331          *Counsel for Plaintiff*
Email: nfaruqi@faruqilaw.com
        jwilson@faruqilaw.com

*Counsel for Plaintiff*